MAYO KNITTING MACHINE & NEEDLE CO. v. JENCKES MFG. CO. et al.

(Circuit Court, D. Rhode Island.   March 12, 1903.)

No. 2,561.

1. PATENTS—INFRINGEMENT—KNITTING MACHINES.

The Mayo patent, No. 363,528, claim 2, covering a mechanism for "widening" in a circular knitting machine, the essential feature of novelty being its needle depressing pickers, is limited to the particular construction shown and described, in which the depressing pickers slide in the guide-plates. As so construed, *held* not infringed.

2. SAME—COMBINATIONS—OMISSION OF PARTS.

While it is unnecessary in a claim of a patent to specify ordinary means for applying power or causing motion, it is necessary to specify the parts whose co-operative action is essential to the performance of the function specified in the claim, and each of such parts is an essential element of the combination, so that infringement cannot be charged of a machine so constructed as to eliminate one of such parts without using an equivalent part.

**3.** SAME—KNITTING MACHINES.

The Mayo patent, No. 461,357, for a circular knitting machine, embodies only mechanical improvements on the machines of the prior art, and is not entitled to a broad construction as against other subsequent improvers. Claims 4 and 6 construed, and *held* not infringed by a machine made in accordance with the Eck patent, No. 592,134. Claim 11 *held* void for lack of novelty in view of the prior art.

**4.** SAME—WINDERS.

The Johns patent, No. 600,788, for a winder for introducing an extra or re-enforcing thread in knitting, was not a pioneer patent, the idea of twisting the free end of one thread about the other by the use of a rotary winder having been disclosed in prior patents, notably the Marshall & Hewitt English patent, No. 4,293 of 1875, and it must be limited to the specific mechanism shown for carrying out such idea. As so limited, claims 1, 2, 3, 4, and 5 are not infringed by the winder of the Rowe patent, No. 581,887, which embodies an essentially different combination.

**5.** SAME.

The Ames patent, No. 600,671, for a winder for introducing an extra thread in knitting, being an improvement on that of the Johns patent, No. 600,788, claims 8, 10, and 11 construed, and *held* not infringed by the winder of the Rowe patent, No. 581,887.

**6.** SAME—MECHANICAL IMPROVERS.

As between mechanical improvers in an advanced art, mere priority in the production of a commercial machine or commercial success affords no reason for excluding other and independent improvements.

In Equity. Suit for infringement of letters patent No. 363,528, issued May 24, 1887, and No. 461,357, issued October 13, 1891, each for a circular knitting machine, and granted to William H. Mayo and George D. Mayo; and No. 600,788, granted March 15, 1898, to Will R. Johns, and No. 600,761, granted March 15, 1898, to Arthur N. Ames, each for thread-feeding mechanism for knitting machines. On final hearing.

W. K. Richardson and A. D. Salinger, for complainant.
Wilmarth H. Thurston, for defendants.

BROWN, District Judge. The four patents sued upon are: Mayo, No. 363,528, May 24, 1887; Mayo, No. 461,357, October 13, 1891; Johns, No. 600,788, March 15, 1898; Ames, No. 600,761, March 15, 1898.

The Mayo patents relate to circular knitting machines. The Johns and Ames patents are called the "Winder" patents, and relate to means for introducing an extra thread in knitting. In a circular knitting machine, the leg of the stocking is knitted in tubular form by means of a needle-cylinder and a cam-cylinder, the cams acting upon the needle-butts. To knit the heel, tubular knitting is suspended, about one-half of the circle of needles is thrown out of operation, and, instead of a circular movement, a reciprocating movement is used. In the operation of narrowing, at each reciprocation one of the remaining needles is thrown out of action, first at one end and then at the other, gradually narrowing the courses. When the narrowing operation is complete, one needle is thrown back into operation at each reciprocation, first at one end and then at the other, thus gradually widening the courses. The widening corresponds to the previous narrowing. In widening, the widened portion is joined

to the narrowed portion, thereby forming the heel pocket. This done, circular knitting is resumed to form a tube for the foot. The toe is knit in the same manner as the heel, the toe being closed on another machine. Originally the needles were shifted, i. e., lifted from a working to an idle position, or depressed from an idle to a working level, by a hook or pick in the hand of an operator. The Mayo patents relate chiefly to automatic pickers, or mechanical means for lowering and raising the needles, thus shifting them into and out of operative position during narrowing and widening. To those parts which engage the needle-butts and shift the needles we may apply the generic names "pickers" or "shifters," since they pick off and shift the needles; and, to distinguish between pickers, we may call those pickers which, in widening, depress the needles from the higher or idle level to the lower or working level, "depressing pickers" or "droppers," and those which, in narrowing, raise the needles from the working to the idle level, "lifting pickers." These "pickers" are the chief subject-matter of the Mayo claims. The claims of Mayo in issue are claim 2 of the 1887 patent, and claims 4, 6, and 11 of the 1891 patent.

Claim 2 of the Mayo 1887 patent is:

"2. The cam-cylinder, its attached annular ledge, and the needle-elevating and stitch-cams combined with guide-plates G 1 G 2, and with the needle-depressing latches l 2, l 2, arranged to slide in the said guide-plates, to operate substantially as and for the purposes described."

This claim relates to the widening operation; and the complainant's brief says that the sole element of novelty is the "needle-depressing latches," i. e., the "depressing pickers" or droppers, and, further, that the only material thing is that the picker should slide diagonally in the guide-plates and itself get out of the way of the following inoperative needles.

The prior patent to Branson, No. 333,102, December 29, 1885, discloses both lifting and depressing pickers which are engaged by the needle-butt, so that the needle-butt moves the picker while the picker moves the needle-butt. The chief distinction is that in Branson the diagonal movement of the picker is guided by a pivot from which the picker is suspended, while with Mayo and with the defendants the picker is guided within inclined walls. Mr. Livermore, complainant's expert, says:

"A movement in a very short arc of a circle does not differ widely from a straight line movement of equal extent, and, where the difference between the slightly curved and straight movement in no wise affects the operation desired to be produced by the movement, I should generally regard the use of a pivot or of a guideway to support and guide the object moved as being well known mechanical equivalents of one another, and should consider, in general, that no substantial novelty would be involved in the substitution of either form of guideway for the other."

This is a concession that, so far as the diagonal movement of the picker in shifting the needle-butt from the upper to the lower level is concerned, the complainant's device is substantially similar to Branson's, the difference being merely in the substitution of a mechanical equivalent.

Mr. Livermore seeks to avoid the evidence of the defendants' expert as to the practical equivalency of both defendants' and complainant's diagonal movement in the shifting process to that of Branson by pointing out that the sliding pickers of the Mayo patent—

"Do not have to follow their needle shifting movement with any further movement, in the same or in a different direction, to get out of the way of the following needle-butts, and this is possible because of their operation with a sliding movement, as distinguished from the operation of all prior pickers of this general class."

If we consider that the substance of Mayo's 1887 invention was his means for avoiding contact with the following needle-butts, it is apparent, I think, that there is a substantial difference between the Mayo device and the defendants' device; for Mayo's sliding pickers, having a downward and an upward movement in a fixed plate, require locking devices to hold them out of contact with the needle-butts at each reciprocation. The defendants, instead of devices of this character, employ a pivoted carrier to give a swinging movement, which, while it does not entirely avoid contact with the following needle-butts, so diminishes the friction of the contact that it does not impede the working of the machine. Like Branson, the defendants follow the needle-shifting movement by a swinging movement of the picker. A pivoted carrier to effect this movement is novel with the defendants.

If, therefore, we consider that the prior art discloses equivalent means of moving the depressing pickers in a diagonal path from the idle to the working level, and that the important thing to be accomplished was to avoid contact with the needle-butts, I am of the opinion that the defendants do not infringe, since they employ substantially different mechanism for this purpose. It should be remarked that the Mayo 1887 patent has never gone into commercial use, and that it is proven that the pivotal movement permits of a better mechanical construction than the sliding movement.

The complainant attempts to lessen the anticipatory effect of the Branson patent by showing that the machine of Branson was not efficient for performing the full function of a knitting machine. Such an argument is unsound, since it shifts from an examination of a machine part to an examination of a completely organized knitting machine. Claim 2 is admittedly only for special machine parts which in themselves are incapable of operation, or of performing the full functions of a knitting machine. Complainant's expert says:

"I should say that the elements of claim 2 of the 1887 patent did not constitute a complete operative combination in the sense of one that is capable of especially performing its full service in the machine, without some means or provision for preventing them from interfering with the needle-butts except at the time when they are intended to co-operate therewith; or, in other words, without something that might be regarded as an equivalent for the latches or locking devices that perform this function in the complete construction shown in the Mayo 1887 patent. Of course, the combination recited in claim 2 of the patent, as it stands, is operative for the purpose of shifting the needle-butts at the time required; but some further provision is necessary in order to enable the combination to perform this office in the regular working machine, and such provision is shown and described in the patent, being the locking devices and means for tripping or disengaging them at the proper time."

The case of Branson v. Kutz, 47 C. C. A. 421, 108 Fed. 391, is cited as a decision that Branson's machine was inoperative; but it was said in that case, "This question largely turns on whether the needle-lifting lever, when set, is depressed and raised by virtue of a torsional tension exerted through the end;" and that decision shows that the controversy was principally over the operation of the lifting pickers. It is not a decision to the effect that the depressing pickers of Branson were inoperative, or that the machine of Branson was inoperative by reason of the construction of his depressing pickers. Mr. Livermore testifies that the operation of the depressing pickers of Branson is substantially different from that of his lifting pickers, and that Branson's depressing pickers are operative, although he characterizes the construction as poor.

Upon consideration of the arguments and the testimony of experts as to the substantial character of Mayo's 1887 invention, I am of the opinion that claim 2 is limited to the particular construction shown and described, to wit, a construction in which the depressing pickers slide in the guide-plates; that the proceedings in the Patent Office require such a limitation; and that the prior art prevents any broader construction of the claim.

Claim 4 of the Mayo patent of 1891 is as follows:

"4. In a knitting-machine, the needle-cylinder and the needles carried thereby, combined with a cam-cylinder provided with stitch-cams and needle elevating and depressing cams having fingers or hooks, the fingers of the elevating cams engaging but a single needle and the fingers of the depressing cams being of such length as to engage two needles, latches to normally hold the said elevating and depressing cams in inoperative position, and devices through which the cam-cylinder may be reciprocated, whereby in the operation of the machine two needles may be returned into action at each reciprocation of the cam-cylinder, and one of said needles carried out of action at the next reciprocation thereof in the opposite direction, and so on, to effect the widening of the fabric, substantially as and for the purpose specified."

The defendants deny infringement on the ground that their machine does not contain "latches to normally hold the said elevating and depressing cams in inoperative position." By "elevating and depressing cams" is meant lifting and depressing pickers. These latches are essential elements of the combination of claim 4, not only because the patentee by enumerating them, and by his action in the Patent Office, has made them so, but also because they are essential to the performance by the machine of the patent of the functions set forth in the claim, to wit, returning two needles into action at each reciprocation of the cam-cylinder, and carrying one of said needles out of action at the next reciprocation in the opposite direction, to effect the widening of the fabric.

While claim 2 of the 1887 patent may, perhaps, be regarded as a claim for a subcombination, or for machine parts, and thus escape the objection of inoperativeness, though the latches which are necessary are not included (Deering v. Winona Harvest Co., 155 U. S. 302, 15 Sup. Ct. 118, 39 L. Ed. 153), claim 4 of the 1891 patent is for a combination which can effect the widening of the fabric, and requires the enumeration of the mechanical parts which co-operate to

this result. While it is unnecessary to specify ordinary means for applying power or causing motion, it is necessary to specify the parts whose co-operative action is essential to the performance of the function specified in the claim. It is proved that the machine described in the 1891 patent cannot perform the specified function without the co-operation of the latches, which at appropriate times clutch and hold the picker out of the path of the following needle-butts, and at appropriate times releases the picker so that it may come into engagement with the needle-butt. A combination of elements which does not employ, to hold and control the pickers, any latches or equivalents therefor, would not infringe claim 4. I am clearly of the opinion that the defendants' machine has no elements that fairly can be called the equivalent of complainant's latches for holding the lifting pickers in inoperative position. Because of a different construction and arrangement of lifting pickers and stitch-cams, and of a different relation of lifting pickers to stitch-cams, it follows, to use the language of complainant's expert:

"In defendants' machine the lifter which operates in, say, the right to left movement of the needle, is never in the path of movement of the needles traveling from left to right, as they follow a different path in the cams in the movement in one direction from that followed in the other direction."

What Mayo accomplishes by stitch-cams, lifting pickers, latches, and trippers, the defendants accomplish by stitch-cams and lifting pickers in a new relative location. It is unnecessary to hold the lifting picker out of the path of the needles at the next reciprocation, because the lifting picker travels in a path which takes it out of the way. This feature has been adopted, in substance, by the complainant's expert in constructing the Livermore illustrative model, which is presented to establish the irrelevant proposition that an operative combination of the other elements of claim 4 might be made without the use of latches. While a considerable amount of testimony has been devoted to it, this model seems to be of no value in the case, for the reason that it adopts a material feature of the defendants' machine, and tends to prove a fact which, if true, is irrelevant.

Mr. Livermore, complainant's expert, testifies that he should regard a change of location of the pickers relative to the stitch-cams as an equivalent for the locking devices and trippers of the Mayo machine, since this change of location performs the same office as the locking devices and trippers. But this is an erroneous view of equivalency, for a combination of stitch-cams and pickers which renders the use of latches unnecessary, obviously does not contain "latches," nor a mechanical equivalent for "latches." The mere fact that the same function is accomplished in the two machines does not make a case of equivalency. Westinghouse v. Boyden, 170 U. S. 537, 569, 18 Sup. Ct. 707, 42 L. Ed. 1136.

I am also of the opinion that the defendants' machine has no latches for the depressing pickers, nor any equivalents therefor. With Mayo, the depressing pickers are controlled and timed in their action by the spring latches and trippers, which operate at each reciprocation of the machine in widening. When the picker has carried down a needle, the picker is grasped and held until, at the proper time, it is tripped

and released. In the defendants' machine, the pickers and needles are so arranged that the needle-butts will both depress and release the pickers.

The defendants' picker, after it has carried down a needle, is not, like Mayo's, locked in inoperative position, but, as soon as it is disengaged from the needle-butt, springs up under the following needle-butts, which hold it down during the movement in one direction. Upon reversal, the needle-butts on the return stroke would themselves depress the pickers, this being possible because the picker is mounted upon a pivoted carrier, which turns on its pivot and allows the needle-butts to travel over the top of the picker. With Mayo, the needle-butts cannot depress the picker on the return stroke, therefore the picker must then be latched out of the way.

The defendants' machine would be operative, if only the needle-butts were used to hold down the pickers. Instead, however, of giving to the needle-butts the function of depressing and holding down the pickers on the back or return stroke, a pair of cams called "hold-down cams" are employed to perform the function of depressing the pivoted carriers. These hold-down cams are not the equivalents of Mayo's latches and trippers. They do not in themselves perform the function of Mayo's latches, to hold and release the picker. They merely swing down the pivoted carrier at the beginning of the return stroke, hold it down during that stroke, and release it at the forward stroke; so that the picker rides along the under side of the needle-butts during the forward stroke. The principal function of the hold-down cams and pivoted carriers is to avoid friction between the needle-butts and pickers. They are not essential to the operation of the defendants' machine.

If we are to make a comparison between the means whereby Mayo and the defendants hold the pickers out of engagement, we must compare Mayo's latches and trippers with the defendants' hold-down cams and pivoted carrier and needles combined. But these could not be substituted for Mayo's latches in Mayo's machine. It would be necessary to go still farther; to change the construction of the parts, and to give to the pickers of Mayo new movements in addition to their present movements. In other words, the parts which the complainant's expert regards as equivalents could not be used in Mayo's machine without starting practically anew from the old cam-cylinder and needle-cylinder, and making new parts and a new combination of parts.

In dealing with the 1887 patent, we have already expressed the opinion that the means for avoiding contact with the following needle-butts are substantially different in Mayo's 1887 machine and in the defendants' machine, and this is equally applicable to Mayo's 1891 machine, which employs substantially the same latches as the 1887 machine.

The complainant's method of showing that the defendants' machine has the equivalent of the complainant's latches is by showing that the machine of the defendants has means for performing the same function, namely, keeping the pickers out of the way of the following needle-butts. But every operative picker machine must do this in

some way; and the complainant's brief admits that one principal difficulty with the machines of the prior patents was that the pickers did not get out of the way of the following needle-butts. Special means for doing this form the subject-matter of claims of both of Mayo's patents.

There is seeming inconsistency in the complainant's case, which presents claims of patentability for particular means of solving a principal difficulty in the prior art, and also the contention that, when construing claim 4, any appropriate means for controlling the pickers are to be regarded as mere mechanical equivalents. Thus, the complainant's expert contends that any means of accomplishing this function are equivalent; that an arrangement of stitch-cams and pickers containing no latches at all is the mechanical equivalent of latches; that an arrangement of needle-butts and pickers, whereby the butts hold down the pickers, is the equivalent of latches; that cams which give a swinging movement to the carrier and hold the carrier, and thereby diminish the friction between the needle-butts and pickers, are latches in the sense of Mayo's claim. The mere fact that two combinations perform the same functions does not prove that they contain the same mechanical elements.

I find, therefore, that the machines of Mayo and of the defendants employ substantially different means for controlling the pickers; that the defendants' machine does this, not by means to hold and release the pickers, which are a mere substitution for latches, but by novel combinations and novel parts. The new combination involves a reconstruction of the stitch-cams, and the arrangement of lifting pickers in such a way that they are independent of controlling devices, novel construction and mounting of both lifting and depressing pickers, and novel paths of movement for both pickers and picker carriers, as well as novel means for imparting and controlling the movements.

The defendants construct their machine by license under the Eck patent, No. 592,134, which seems to me to be for combinations quite different from that covered by claim 4 of the Mayo patent. It is quite true that Mayo was first to perform what is known as the "two and one" operation on a machine of the cam-cylinder and picker type, and that this involved features not in the prior art: First, depressing pickers with fingers long enough to take down two needles, and the use of both lifting and depressing pickers in the operation of widening; and that he effected the object of closing up the loose loops in the seams in a manner somewhat different from that of the prior art. In these particulars, the defendants' machine adopts features which were new with Mayo.

In the cam-cylinder machines of the prior art, the lifting pickers were used only for narrowing, and the depressing pickers only for widening; in Mayo's 1891 patent, both lifting and depressing pickers take part in the widening operation. From the employment of the old, or "one and one," method in both narrowing and widening, there results an imperfect juncture at the heel seam, a series of small holes being left along the seam where the narrowed and widened fabrics were joined. Mayo's junction between the narrowed and widened portions of the heel pocket is effected not simply by the fact that he

widens by the "two and one" method, but also because his machine has lifting pickers which engage but a single needle. His machine, therefore, must narrow by the one and one method. It is the combination of the one and one method of narrowing with the two and one method of widening which, in the Mayo machine, effects the closing of the series of small holes which had existed when both narrowing and widening were effected by the one and one method.

While Mayo was the first to employ the two and one operation for widening in a cam-cylinder and picker machine, he was not the first to employ, in a knitting machine, and for the purpose of closing up the loose loops, that method of manipulating the needles which is known as "two and one." The patent to Shaw, No. 228,480, discloses a pattern chain or Jacquard mechanism for automatically controlling the needles, which will cause two needles to be returned into operation, and will cause one of said needles to be carried out of operation. Mr. Livermore testifies:

"So far as appears from the Shaw specification, he attains the result of closing up the loose loops formed on the edge of the narrowed portions by using the two and one operation in throwing the needles out of operation, so that the narrowing courses end differently from those of the Mayo fabric, and in then knitting on a continuous row or two, and then widening with the two and one operation, with the ends of the widening courses running into the intermediate continuous courses made after the narrowing was completed. Whether or not the advantages resulting from this operation are equal to those resulting from the Mayo two and one operation, so far as the character of the fabric is concerned, it is clear that they are not the same advantages, and that they are not produced in the same way, and that the resulting fabrics are not the same."

The difference between Mayo and Shaw, in the method of closing up the holes, is not in the use of the "two and one" method for the widening operation (to which claim 4 relates), since both use it; but it is in the operations which precede widening. Mayo's widening courses are attached to the narrowed courses which have been knitted by the one and one method. Shaw's narrowing is performed by two and one; he then knits his straight courses, and then proceeds to widen exactly as Mayo proceeds to widen, by two and one. It has not been made to appear that Mayo's method of knitting, first by one and one, and next by two and one, is superior to Shaw's method of knitting by two and one, straight courses, and two and one; or that his seams are substantially different from those shown in the defendants' "Exhibits Sample Heels." The function of claim 4, "Two needles may be returned into action at each reciprocation of the cam-cylinder, and one of said needles carried out of action at the next reciprocation thereof, in the opposite direction, and so on, to effect the widening of the fabric," is limited to the widening operation; and there is no distinct claim which covers Mayo's entire process in forming the heel.

The patent cannot be construed as covering a method of knitting, consisting in joining to the one and one narrowed portion the two and one widened portion. The same process, therefore, may be performed by other machines, provided they are not substantially similar to Mayo's. Thus, there is nothing in the Mayo patent which

would prevent performance of one and one, followed by two and one, upon Shaw's Jacquard mechanism, or upon various other machines in which the needle-butts are controlled by means other than a cam-cylinder.

I am unable to find, in what Mayo did, any conception so broad as to require us to regard all cam-cylinder machines as substantially the same, regardless of their differences in the very important mechanical features for controlling the pickers. The manner of handling the needles by two and one was old in Shaw, and the broad idea of automatic mechanism which should bring two needles into operation and take one out was old with Shaw. The general conception of using two and one for closing up seams was old with Shaw. The broad idea of perfecting a cam-cylinder machine so that it could perform all known knitting operations, and handle the needles in all known ways, was one that was open to all inventors of specific types of knitting machines. The rule for handling the needles, known as the "two and one," prescribed the general law for all mechanisms. They must be such as to operate upon the needles in this particular way.

I agree with the defendants' counsel that, after Shaw, there was no invention in the idea of doing "two and one" on a picker machine, and that all one could claim after Shaw was the particular construction and combination of parts which he should devise for that purpose. I disagree with the complainant's expert, who attributes to Mayo the novel conception that a benefit could arise from "employing the net result of two antagonistic but unequal agencies," and with his illustration, "It is as if some one should discover that the best way to get a hod of coal upstairs would be to carry up two and then carry one of them downstairs again."

This broad conception is in Shaw's patent, and was not Mayo's. Mayo's was the narrower conception of means to do it. How to make a cam-cylinder machine take down two needles and put out one was his problem. The taking down of two needles involved the mechanical change of a longer picker finger; the taking out of one needle involved the use of the lifting pickers in widening, and this was new, though necessarily involved in the idea of doing two and one on a picker machine. But after this, it was necessary to control the pickers in order to make the machine operative. Mayo disclosed nothing in his patents which anticipated the defendants' devices for controlling the pickers.

Mayo's completed conception was a combination which included, as an essential part, specific means for controlling the action of his pickers. Leave these out, and he had merely a novel machine part —a picker with a finger of double length—and a conception of a mode of operating his pickers which was not embodied in mechanism. This was not enough to secure a patent for a machine which would carry down two needles and take out one. He was required by the Patent Office to include locking devices, "in order to render complete and operative the combination." His acquiescence was an admission that locking devices or latches were essential to make an operative combination of the parts shown. A like admission was made by the com-

plainant's expert. The force of this admission as to the machine of the patent is not lessened by evidence that the elements enumerated in the claim can be combined in a different way, or brought into a new combination with other elements, so as to be operative. That Mayo or his expert could make a different machine from that of the patent, and read the claim upon that machine, would not alter the fact that Mayo conceded that his invention was one of certain mechanical limitations.

Upon a somewhat laborious examination of the extended discussion of this claim by counsel and experts, I am of the opinion that Mayo's claim 4, when restricted to include latches of substantially the same mode of operation as those shown in the patent, is fairly commensurate with his actual invention, and is not infringed.

Claim 6 of the Mayo 1891 patent is as follows:

"In a knitting machine, a needle-cylinder and needles carried thereby, and cam-cylinder provided with a slot, combined with a needle operating cam pivoted outside the said cam-cylinder, and extended through the said slot to operate upon the said needles and be operated thereby, substantially as described."

The pickers are pivoted outside the cam-cylinder, and their hooked ends project inwardly through diagonal slots in the cam-cylinder. The complainant's brief says:

"The body of the shifter is thus entirely out of the way of the succeeding needles, and, as the hooked end retreats with the needle to be shifted, it is removed from the path of the butts of the following needles."

The inward and outward movement of the end of the picker, which is the important feature, is due to a particular mode of pivoting. The pivotal axis, about which the picker swings, extends in an inclined direction on the outside of the cylinder, and the slots are inclined slots. The picker swings radially in and out of the cylinder in an inclined direction, and has only a swinging or pivotal movement. This radial movement is essential. This feature is not found in the defendants' lifting pickers, which alone are said to infringe claim 6, and which are not so pivoted as to move in and out of the cam-cylinder by a pivotal movement. The defendants' pickers proper are not pivoted, but are sliding pins which slide in a pivoted carrier. Though this carrier gives to the pickers a swinging movement, this movement does not carry the picker ends in and out of the slot. Both a pivotal movement of the carrier and a sliding movement of the pickers are necessary to the operation of the defendants' device. As the operativeness of the complainant's pickers depends upon a particular mode of pivoting which permits a radial movement in and out of the cam-cylinder, the claim must be limited to a construction having that mode of pivoting which will permit the necessary movements of the pickers.

The remaining feature, of putting the body of the picker outside the cam-cylinder and only its working end through a slot, so that the body of the picker will be out of the way, did not, in my opinion, involve patentable invention. The idea of bringing only the working end of a mechanical part through a hole or slot in such manner as not to interfere with other working parts is one so common to the mechanical arts, as well as to this art, that only a specific and

novel application of this idea could be patentable. The art is full of examples of sliding parts whose working ends project through slots in the cam-cylinder, and whose bodies are outside and out of the way. Whether the body of the part is supported by a pivot or a guideway would seem to be entirely immaterial. Mr. Livermore concedes, as we have seen in connection with the 1887 patent, that no substantial novelty would be involved in substituting a pivot for a guideway.

The sliding constructions are a complete anticipation of the idea of putting the body outside and out of the way, and the working end through a slot, and would anticipate Mayo's claim, if we should disregard the special mode of pivoting and the special movement of the pickers resulting therefrom. But, aside from any question of anticipation, the patents to Kelly, No. 372,374, and to Lippitt, Nos. 396,578 and 394,587, show that the broad feature of a part pivoted outside and having its working end extended through a slot was a feature of mechanical construction that would readily suggest itself to the mechanic, and a feature which did not in itself offer a solution of the real problem of making the working ends of the pickers get out of the way of the following needle-butts.

It is clear, I think, that the substance of the invention disclosed by Mayo's pickers, and covered by claim 6, was in the use of a special mode of pivoting which permitted a radial movement into and out of the cam-cylinder. This was an ingenious and patentable feature of construction. If we should disregard this feature, claim 6 would, in my opinion, be invalid. This feature is not used in the defendants' lifting pickers, which, as we have already seen, are essentially different in construction and mode of operation. There is no contention that the defendants' depressing pickers infringe this claim.

I am of the opinion that claim 6, when properly construed, is not infringed. The construction for which the complainant contends seems so untenable as to make it unnecessary to consider the questions of prior use and priority of invention. If the special mode of pivoting is to be disregarded, and claim 6 construed to cover all constructions having pickers pivoted outside and slots in the cam-cylinder for the pickers, there then remains a serious question of fact as to whether Kelly or Mayo was first to construct a knitting machine having these features, and also the defense of two years' public use by Kelly.

Claim 11 is as follows:

"In a knitting machine, the needle-cylinder grooved for the reception of jacks, a series of jacks, a surrounding ring correspondingly grooved for the reception of jacks, and a cam-ring, as a [14], to act upon and move the said jacks, combined with an independent ring, b, overlapping the inner ends of the jacks, the hooks or portions of the jacks engaging the yarn being at the proper space thereof between their ends, substantially as described."

The validity of this claim is disputed. Infringement is conceded if the claim is valid. The feature of novelty is "an independent ring, b, overlapping the inner ends of the jacks." The jacks or sinkers are thin blades which extend inward between the needles, and are provided with hooks to engage the fabric. They are subject to an upward pull.

It was old to employ a ring at the outer end of the sinkers to hold them down against an upward pull. The Mayos put an additional ring at the inner end of the jack, thus making at each end points of resistance to the upward pull. There are said to be two functions of this ring: It acts as a smooth cover to the inner end of the sinkers. It confines the sinkers at the inner ends.

In the patents to Shaw, No. 228,480, and to Gifford & French, No. 438,685, the sinkers are held down at two points by two rings, but both rings are outside the hooks, while with Mayo one is outside and the other inside. The patent to Huse, No. 331,401, and to Aiken, No. 214,744, show respectively sinkers held at each end and on opposite sides of the hooks, and sinkers held on opposite sides of the hooks, by means of plates which overlie the sinkers at opposite ends.

The complainant's expert points out many differences in structure between the devices of Mayo and those of the prior art, which seem, however, generally irrelevant to the function of holding the jacks firmly in position, which is the main point. The testimony of the defendants' expert seems to deal more closely with the exact points involved, and I agree with his opinion that the construction referred to in claim 11 does not embody any substantial novelty in view of the state of the art. I am therefore of the opinion that claim 11 is invalid.

While the Mayo machines exhibit invention, and are useful and practical to a high degree, it must be remembered that they were constructed at a stage of the art when conceptions of a needle-cylinder having needles whose butts should be operated upon by pickers controlled by a cam-cylinder, and of pickers which should be pivoted and should act on the needle-butts while the needle-butts acted upon the pickers, were all old and clearly explained; and that commercial success cannot be invoked to broaden the Mayo claims so as to prevent subsequent inventors from using all that was known in the prior art as to the construction of pickers and methods of handling the needles. The Mayos were not pioneers, but mechanical improvers; and, if they were first to achieve commercial success in this type of machine, this fact does not entitle them to treat as equivalents distinct mechanical improvements of others. That the defendants' machines depend for their operativeness upon novel conceptions not borrowed from Mayo is clear. It appears also that the argument to show infringement of claim 4, upon which principal stress has been laid, involves an erroneous standard of equivalency, and the erroneous legal proposition that two mechanical combinations, though differing substantially in elements, are to be regarded as the same if they perform the same functions.

### The Winder Patents.

These relate to means for introducing an extra thread in knitting, so that parts of the fabric may be re-enforced by using two threads of yarn instead of one. To do this was old. The free end of the thickening thread had been brought into contact with the moving main thread, and by the friction of contact led to the needles. Devices for twisting the free end of the thickening thread about the main thread were also old. The Marshall & Hewitt English patent,

No. 4,293 of 1875, shows a device intended to twist the thickening thread about the main thread by passing both threads into a tube, which is given a rotary movement. The efficiency of this device is questioned. The patent, nevertheless, is a full disclosure of the idea of twisting the end of the extra thread about the main thread, and of the use of a rotary part for that purpose. The patent to Swinglehurst, No. 459,260, September 8, 1891, also shows a rotary winder for this purpose. In considering the winder patents, therefore, we must remember that there was no novelty in the idea of using a rotary winder for the purpose of twisting the free end of the thickening thread about the main thread.

The Johns patent, No. 600,788, March 15, 1898, is the principal of the complainant's winder patents. Claims 1, 2, 3, 4, and 5 are in suit. It is extravagant to call this patent a primary patent, or to treat it as a first disclosure of the idea of twisting the free end of one thread about the other by the use of a rotary winder. This idea was common property, and the Johns patent discloses simply specific means for carrying it out. The free end of the extra thread is held in a clamp affixed to a rotary part. To introduce the extra thread, the clamp, still holding the thread, is rapidly rotated; the clamp holds the end of the thread during the winding; upon its completion the clamp is opened, and the extra thread is free to follow the main thread to the needles. To withdraw the extra thread, the clamp seizes it, and carries it against a knife, which severs it, leaving the free end in the clamp ready to be again attached to the main thread. The substance of Johns' invention is a clamp which seizes and holds the free end of the extra thread while the rotation of the clamp carries the end about the main thread.

The defendants' mechanism is said to infringe because it has Johns' leading feature of a rotary winder, which will effect the desired result. This is either a mere appropriation by the complainant of the field of the prior art, or a claim that performance of the function is a proper test of the identity of two combinations when the function is old.

Each of the claims of the Johns patent calls for a "rotary winder." What distinguishes Johns' rotary part from Marshall & Hewitt's is, not the rotary movement, but that the rotary part is made a clamp which positively seizes the thread and carries it around the main thread. What makes the rotary part an efficient winder is the fact that it is a rotary clamp. If we leave this out of the Johns patent, there is substantially nothing left but the mere suggestion of the use of a rotary part, and this certainly was in Marshall & Hewitt. It follows that, unless the claims are limited to a rotary winder which is a rotary clamp, they are invalid; since, read as the complainant reads them, they are for an invention not sufficiently described in the specification, and are anticipated by Marshall & Hewitt and Swinglehurst. Moreover, if the claims should be given a construction broad enough to include the defendants' winder, there would remain a grave doubt whether they are not invalid for the reason that they were introduced by amendment in such manner as to bring them within the doctrine of Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053.

The defendants' rotary part is not a clamp, but a cylinder having a large opening or slot on the side. Independent clamping jaws carry the free end of the extra thread across the edge of this slot, causing a length of thread to project outside; the thread is struck by the edge of the slot in the rotating cylinder; the jaws open to release this thread, which is thrown or whipped loose around the main thread. The defendants' clamp does not rotate, and the end of the thread is not clamped or held by the winder while it is being wound round the main thread. The thread is not closely wound, as in Johns, but loosely thrown around the main thread. The means for severing are also substantially different. The defendants' mechanism is shown in the patent to Rowe, No. 581,887, and is, in my opinion, a combination substantially different from that of Johns. Claims 1, 2, 3, 4, and 5, therefore, if valid, are so limited that they are not infringed.

The Ames patent, No. 600,671, March 15, 1898, is conceded to be merely for an improvement upon Johns, and to have the same mode of operation in carrying the end of the extra thread around the main thread. Claims 8, 10, and 11 are in issue.

Ames, like Johns, employs a rotary clamp, but a clamp of different construction. The rotary part is a sleeve having on one end a series of projections or wires forming a ring-like brush. Means are provided for bringing the extra thread into engagement with the brush. The extra thread is held between the projections only by friction, and is readily pulled out from between the projections by the main thread after sufficient winding has taken place. The projections hold the extra thread during the time that only the main thread is passing to the needles.

Marshall & Hewitt's rotary tube had no provision for positively grasping the extra thread. Johns' rotary winder had a clamp which closed to grasp the extra thread and opened to release it. The Williams patent, No. 491,327, February 7, 1893, shows a winder somewhat similar to Johns, and in which the free end of the extra thread is held in clamping-jaws which form a part of, and are rotated with, the winder. When the extra thread is not in use, its free end is clamped between two jaws on the end of a rotary sleeve. When the extra thread is to be introduced, the clamp is rotated, carrying the end of the extra thread around the main thread by a positive clamping device, which must be unclamped to release the thread. The Ames rotary clamp does not require means for unclamping it.

The point of novelty which the complainant points out in the Ames device is that the Ames holder and clamp does not have to be unclamped.

The defendants' rotary part has no device for positively clamping the extra thread. It is not a rotary clamp. It does not act as a holder when the extra thread is not in use, and has no provision for unclamping, because it has no provision for clamping. The extra thread is drawn out from the interior of the rotary cylinder, through a large slot in the side, by an independent arm which grasps the end of the thread and holds the thread across the edge of the slot in the cylinder. Upon rotation, the edge of the slot engages the extra thread, not at the end, but at a considerable distance from the end,

which end is held by clamps on the arm during nearly the whole of the first revolution. The clamps are then opened, releasing the thread, which is, by engagement with the side of the slot, thrown forward and loosely whipped around the main thread.

The complainant concedes that the defendants' rotary part has no clamping or holding function like that of Ames' ring-like brush. Reference is made, however, to the fact that the holding function is performed by the clamps upon the defendants' independent arm. But these clamps, like those of Johns and Williams, do require to be unclamped in order to release the thread, and therefore it makes little difference whether we look at the rotary part itself or at the combination as a whole. The defendants' rotary part has no clamp which need not be unclamped, because it has no clamp at all; and the clamp used on the independent thread arm is a clamp that, like that of Johns and Williams, requires to be unclamped. The defendants' combination is the subject of letters patent to Rowe, No. 581,887, and, in my opinion, is substantially different from that of Ames in its mechanical elements, the method of combining them, and in the method of handling the thread.

Upon the whole case, it may be said that the defendants' devices have been recognized by the Patent Office as patentably different from the complainant's, and that they display quite as much inventive skill and originality as do the devices made according to the patents of the complainant. Both complainant and defendants are mechanical improvers in an advanced art; and mere priority in the production of a commercial machine, or commercial success, affords no reason for excluding from the field other independent improvements. The first commercial success in practically developing a machine may stimulate other mechanics to enter the field as competitors. They do not, however, become infringers merely because they become competitors.

The bill will be dismissed.